UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MATTHEW WARMAN, | : | Case No. 1:22-cv-229 |
| | : | |
| Plaintiff, | : | Judge |
| | : | |
| v. | : | |
| | : | |
| MOUNT ST. JOSEPH UNIVERSITY, | : | |
| | : | |
| and | : | |
| | : | |
| MOUNT ST. JOSEPH POLICE DEPARTMENT, | : | VERIFIED COMPLAINT AND JURY DEMAND |
| | : | |
| and | : | |
| | : | |
| KEVIN KOO, | : | |
| | : | |
| and | : | |
| | : | |
| NORB KOOPMAN, | : | |
| | : | |
| and | : | |
| | : | |
| KAREN ELLIOTT, | : | |
| | : | |
| and | : | |
| | : | |
| AMY METZGER a/k/a AMY DENKO, | : | |
| | : | |
| and | : | |
| | : | |
| PAIGE ELLERMAN, ESQ., | : | |
| | : | |
| and | : | |
| | : | |
| NANCY HINZMAN, | : | |
| | : | |
| and | : | |

| | |
|---|---|
| **JOHN DOES 1-20, said names being** | : |
| **fictitious,** | : |
| | : |
| **and** | : |
| | : |
| **ABC AGENCY, INC. 1-5, said names** | : |
| **being fictitious,** | : |
| | : |
|            **Defendants.** | : |

COMES NOW Plaintiff, Matthew Warman ("Mr. Warman"), by and through his undersigned legal counsel, and for his Complaint against Defendants Mount St. Joseph Police Department, Kevin Koo, Norb Koopman, Mount St. Joseph University, Karen Elliott, Amy Metzger a/ka/ Amy Denko, Paige Ellerman, Esq., Nancy Hinzman, John Does 1-20, and ABC Agency, Inc. 1-5, with knowledge as to his own acts, and upon information and belief as to all others, alleges as follows:

## INTRODUCTION

1.      This matter is brought by Mr. Warman, a veteran of the United States Marines who was a top level graduate student in nursing at defendant Mount St. Joseph University, whose deeply held Catholic religious objection to receiving a COVID-19 vaccine due to it deriving its research and/or production from fetal cell lines, and his exercising his absolute statutory right to decline to take one of such Emergency Use Authority vaccines, which are designed to protect against the Sars-CoV-2 virus, resulted in his being harassed, humiliated, targeted, and ultimately having his nursing studies destroyed by the Defendants, resulting in damage to him including, but not limited to, severe emotional distress.

2.      Mr. Warman was admitted to Mount Saint Joseph University with a 50% medical disability related to his service with the Marines. Defendants knew that Mr. Warman was suffering from clinical depression and anxiety upon his admission to the University and throughout his time there. Yet Defendants thereafter acted in an extreme and relentlessly cruel manner toward Mr.

2

Warman because he wanted to exercise his religious liberty and freedom of conscience. Included among such extremely cruel and illegal acts by Defendants was having Mr. Warman's picture, motor vehicle description, license plate, and class schedule posted in the Mount St. Joseph Police Department with instruction that he be confronted by police officers even though Mr. Warman was peaceful and legally on premises. Mount St. Joseph Police officers also wrongfully detained Mr. Warman and told him that he should change his religion, among other cruel and humiliating conduct which was designed to harass him into getting vaccinated against his will.

3.       The nun in charge of Mount St. Joseph University's COVID-19 response and for assessing religious exemption requests, who also is its Director of Mission and Ministry, Karen Elliott, told Mr. Warman that his religious beliefs must yield to modern necessity, contrary to the teachings of the church. Defendant Elliott also told Mr. Warman that she was obligated to follow the Pope's assessment that getting vaccinated against COVID-19 was a moral imperative. Today, after Mr. Warman has been so severely damaged, Mount St. Joseph's University has dropped its vaccine requirement even though Pope Francis has not changed his position that being vaccinated is a moral imperative, thus demonstrating the falsity of Defendants' position as to compulsory vaccination in keeping with the Pope's assessment.

4.       Upon information and belief, Defendants, or some of them, also had a Federal Bureau of Investigation ("FBI") agent, or someone holding himself out as an FBI agent, contact Mr. Warman's Veterans Administration psychiatrist to falsely portray Mr. Warman as being dangerous. Mr. Warman presented no danger at all and never acted in any manner which would provoke such a call, but instead, simply wished to finish his studies without compromising his sincerely held religious beliefs.

3

5.      Defendants' conduct was particularly opprobrious in light of their knowledge of Mr. Warman's physical injuries and related depression and anxieties arising from his time in the service of the United States Marine Corps. Mr. Warman now complains of Defendants for statutory violations of his civil rights and for common law violations of his rights in order to be vindicated for having been so thoroughly violated by the Defendants, and which have caused grievous physical, emotional, psychological, and pecuniary damage to Mr. Warman.

## PARTIES

6.      Mr. Warman is an individual with an address of 123 Fairborn Avenue, Hamilton, Ohio 45013.

7.      Mount St. Joseph University ("MSJU") is an accredited Catholic University located at 5701 Delhi Road, Cincinnati, Ohio 45233, and was a state actor with respect to the actions of its police department, which was under its dominion and control, set forth herein.

8.      Mount St. Joseph Police Department ("MSJPD") is the police and public safety department of MSJU, and is a commissioned law enforcement agency of the State of Ohio and, as such is a state actor, is under the dominion and control of MSJU, and is located at Mount St. Joseph's University, 5701 Delhi Road, Cincinnati, Ohio 45233.

9.      Kevin Koo is an individual who at all relevant times was employed by, and acted under the authority of, MSJU and MSJPD, is the Chief of Police of the MSJPD who, as such, acted individually and in his capacity as a state actor, and is located at % MSJPD, 5701 Delhi Road, Cincinnati, Ohio 45233.

10.     Norb Kooperman is an individual who at all relevant times was employed by, and acted under the authority of, MSJU and MSJPD, is Captain of the MSJPD who, as such, acted

individually and in his capacity as a state actor, and is located at % MSJPD, 5701 Delhi Road, Cincinnati, Ohio 45233.

11.    Karen Elliott is the Director of Mission and Ministry at MSJU, and is located at % MSJU, 5701 Delhi Road, Cincinnati, Ohio 45233.

12.    Amy Metzger, a/k/a Amy Demko, is an individual who at all relevant times was employed as the Health Services Manager of MSJU, and is located at % MSJU, 5701 Delhi Road, Cincinnati, Ohio 45233.

13.    Paige Ellerman is an individual who at all relevant times was employed by MSJU as General Counsel, and is located at % MSJU, 5701 Delhi Road, Cincinnati, Ohio 45233.

14.    Nancy Hinzman is an individual who at all relevant times was employed as Assistant Dean in the Department of Nursing at MSJU, and is located at % MSJU, 5701 Delhi Road, Cincinnati, Ohio 45233.

15.    John Does 1-20 are the fictitious names of individuals and/or state actors who acted in ways which are the same or similar to the other individual/state actor Defendants in relation to Mr. Warman and/or who were responsible for creating and administering the University's vaccine policy.

16.    ABC Agency, Inc. 1-5 are the fictitious names for public and/or private agencies or businesses which acted in ways which are the same or similar to the other state actor and /or private entity Defendants in relation to Mr. Warman.

## JURISDICTION AND VENUE

17.    Jurisdiction is appropriate pursuant to 28 U.S.C § 1331, as this matter is brought pursuant to 42 U.S.C. § 1983 arising from violation of Mr. Warman's constitutional rights pursuant to the First, Second, Fourth, and Fourteenth Amendments of the United States Constitution.

18.     Jurisdiction over state law claims also is appropriate pursuant to 28 U.S.C. § 1367 as they share a common nucleus of operative fact with Mr. Warman's federal claims.

19.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claim occurred in Hamilton County, Ohio.

## FACTUAL ALLEGATIONS

20.     Mr. Warman honorably served in the United States Marines between March 3, 2014, and September 18, 2018, at which time he was medically discharged due internal injuries he suffered, and brain tumors that he had developed.

21.     Mr. Warman enrolled at MSJU in or about December 2020 in the graduate nursing program, with an expectation of graduation from said program in spring 2022.

22.     MSJU markets to military veterans, and Mr. Warman applied for admission to the graduate nursing program as a military veteran who had been medically discharged due to physical injuries that he suffered which were beyond his control. While enrolling, MSJU was advised that Mr. Warman was suffering with a medical disability, including that he was suffering with post-discharge depression and anxiety after having undertaken inspiring actions to qualify for enlistment in the Marines, only to be discharged due to suffering serious medical problems which were beyond his control.

23.     Mr. Warman's schooling was paid for with Veterans Administration benefits, of which the Defendants were aware, and which are potentially subject to repayment if Mr. Warman is unable to finish his studies. Defendants acted to prevent Mr. Warman from finishing his studies, and to humiliate and punish him for refusing to be vaccinated.

24.     Pursuant to the MSJ 2020-2021 Graduate Catalog (the "Catalog"), which was in effect at all or most times during Mr. Warman's tenure, to remain in good standing, academically,

6

Mr. Warman only had to "meet specific educational requirements to progress and remain in good academic standing in the program, including:" (1) Maintaining a cumulative GPA of 3.0/4.0 as required by the University for all graduate programs; (2) Earn a grade of B or better in all Category I clinical courses; and (3) Earn a grade of C or better in all Category II didactic courses."

25.    At all times, Mr. Warman satisfied all academic criteria for completing his education, including his having achieved a perfect cumulative GPA of 4.0.

26.    MSJU also has a Nondiscrimination Policy which is set forth in the Catalog, in pertinent part, as follows: "Mount St. Joseph University ("the University") is committed to providing an educational and employment environment free from discrimination or harassment on the basis of race, color, national origin, religious sex, age, disability, sexual orientation, gender identity, or other minority protected status. This commitment extends to the University's administration of its admission, financial aid, employment, and academic policies, as well as the University's athletic programs and other university-administered programs, services, and activities."

27.    MSJU received federal and state financing, is a "place of public accommodation" as defined in Ohio law and must therefore comply with all applicable federal and state anti-discrimination laws.

28.    In the "University Mission Statement" set forth in the Catalog, MSJU affirmatively assert that: "Members of the Mount community embrace: excellence in academic endeavors; the integration of life and learning; respect and concern for all persons; diversity of cultures and beliefs; service to others."

29.    In or about August 2021, MSJU initiated a COVID-19 vaccination policy (the "Policy").

7

30. At the time the Policy was created, every single available "COVID-19" vaccine was authorized by the FDA only under Emergency Use Authority ("EUA"), pursuant to the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb (hereafter, "FDCA § 564"), which is incorporated herein by reference, and is made a part hereof.

31. Defendants knew and/or were charged with knowing the law when enacting the Policy, most particularly when MSJU intended to compel individuals to undergo a medical procedure involving an experimental vaccine.

32. The FDCA is administered by the United States Secretary of Health and Human Services (the "Secretary").

33. Pursuant to FDCA § 564, EUA vaccines only may be made available when "no adequate, approved, and available alternative to the product" exists on the market.

34. As of today, although the FDA has given full approval to two different COVID-19 vaccines, being Comirnaty and Spikevax, neither vaccine is readily available on the market, such that all or virtually all existing COVID-19 vaccines remain available only because of their EUA designation. Such EUA vaccines, including the Johnson & Johnson vaccine, could not be used if alternatives were available, as a matter of law under FDCA § 564. Pfizer and Moderna documents, and related FDA documents, evidencing that Comirnaty and Spikevax are not generally available to the public in the United States are incorporated herein by reference, and are made a part hereof.

35. Indeed, MSJU has now terminated the Policy, after having damaged Mr. Warman, and at the time of such Policy termination, there still were virtually no available fully FDA-approved COVID-19 vaccines on the market, meaning that all or almost all students, staff, and others who were vaccinated pursuant to the Policy were injected with an experimental vaccine.

36.     FDCA § 564 specifies that any person who is offered an EUA vaccine must have "the option to accept or refuse administration of the product," which is fundamental to the patient's informed consent.

37.     The FDA's official position, pursuant to 45 C.F.R. § 45.116(b)(8), which is incorporated herein by reference, and made a part hereof, is that "A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."

38.     Thus, pursuant to federal law, Mr. Warman, has the unqualified legal right to refuse to accept one of the COVID-19 vaccines without penalty or loss of benefits to which he is otherwise entitled.

39.     As of March 14, 2022, which approximates the date that the Policy was terminated, there were 13,273 preliminary reports of vaccine-caused deaths made to the Centers for Disease Control's Vaccine Adverse Effects Reporting System ("VAERS"). As of April 18, 2022, such number has risen to 14,180. Similarly, thousands of cases of myocarditis and pericarditis– potentially life-threatening heart conditions–were reported to VAERS, as were dangerous and debilitating conditions such as anaphylaxis, thrombosis with Thrombocytopenia Syndrome, and Guillaine-Barre Syndrome, among other adverse health effects, some of which, including myocarditis and pericarditis, have been particularly common in young men under 30 years old, such as Mr. Warman.  The CDC's Reported Adverse Events, which contains the subject VAERS data which is periodically updated, is incorporated herein by reference, and is made a part hereof.

40.     Meanwhile, men of Mr. Warman's age have a chance of dying from COVID which statistically, is much below 1%, and closer to zero.

41.     Mr. Warman's pre-existing physical and psychological injuries did not interfere with his ability to complete his coursework, as he maintained a 4.0 Grade Point Average in a program he desired to complete so that he could help people in need.

42.     Upon information and belief, each of the EUA Covid-19 vaccines rely on fetal cell lines in their research and development.

43.     Upon information and belief, mRNA vaccines used fetal cell lines in testing during research and development.

44.     Upon information and belief, the Johnson & Johnson vaccine used fetal cell lines in its production.

45.     Mr. Warman is also a devout Catholic and his sincerely held belief is that the knowing use of the stem cells from aborted fetal tissue is a sin, and that based on his sincerely-held religious beliefs as a conscience Catholic, he could not take any of the EUA Covid-19 vaccines due to their use of fetal cell lines.

46.     Upon the commencement of the Fall 2021 term, MSJU informed incoming students that it was going to require vaccination. Thus, on September 9, 2021, Mr. Warman completed a detailed and thoughtful explanation as to why he could not take the COVID-19 vaccine based on his sincerely held religious beliefs, and thus sought a religious exemption from the school's policy.

47.     On or about September 13, 2021, MSJU released the Policy, which required all current students and employees to be fully vaccinated, and to submit their proof of vaccination to the University by December 15, 2021, absent their receiving a University-approved exemption by making an exemption request prior to November 1, 2021.

48.     On September 15, 2021, Defendant Koo called Mr. Warman to campus to speak with him about Mr. Warman's decision to refuse the vaccine. Defendant Koo called or Defendant

10

Kooperman called, or had Mr. Warman called by others, six times, and emailed Mr. Warman for such purpose.

49.     At approximately 1 p.m. on September 15, 2021, a day Mr. Warman was not scheduled to be on campus, Defendants Koo and Koopman took Mr. Warman into a back room of the campus police station and would not allow him to leave, thus arresting him in fact.

50.     Defendants Koopman and/or Koo told Mr. Warman that he was a "f*****g idiot."

51.     Defendants Koopman and/or Koo told Mr. Warman that he should get a new religion.

52.     Defendants Koopman and/or Koo told Mr. Warman that his beliefs were wrong.

53.     Defendants Koopman and/or Koo handed Mr. Warman Veteran's Administration paperwork and told him to fill it out in order to resign from the University.

54.     Defendants Koopman and/or Koo told Mr. Warman that he "should grow the f*** up and get the damn shot."

55.     Defendants Koopman and/or Koo told Mr. Warman, "you are just doing this because you are failing."

56.     Defendants Koopman and/or Koo told Mr. Warman that for every priest he finds to support him, they can find ten more that share their point of view.

57.     Defendants Koopman and/or Koo told Mr. Warman that he will never be able to find a job.

58.     Defendants Koopman and/or Koo told Mr. Warman that he was using his faith as an excuse to leave the program.

59.     Defendants Koopman and/or Koo told Mr. Warman that they would take him to the student center to get vaccinated.

11

60. Defendant Koo told Mr. Warman that his daughter went to Oak Hills High School, as did Mr. Warman.

61. Defendant Koopman told Mr. Warman that his son attends MSJU.

62. Defendant Koo advised that he had been a mortarman in the Marines and that Koopman was in the Army.

63. Defendant Koopman volunteered that his son got in trouble when he was little at school because he told other kids in his class that his dad was a copy and a bully.

64. Finally, when they learned that Defendant Elliott was unable to come to the police station, they allowed Mr. Warman to leave.

65. Defendants Koopman and Koo kept Mr. Warman detained, without probable cause or reasonable suspicion of any crime being committed or planned, from 1 p.m. until 2:10 p.m., during which time he was not allowed to leave, and during which Defendants Koopman and Koo engaged Mr. Warman in virtually non-stop harassment, and told him that he had to stay there until Defendant Elliott arrived.

66. Mr. Warman, who already suffered with clinical anxiety and depression which was known to the University, suffered grievous psychological harm and damage as a result of the harassment, intimidation, and false arrest of him by MSJPD, Koo, and Koopman.

67. On September 17, 2021, the MSJPD posted a Memorandum on the wall of the police department from Defendants Koo and Kooperman which was addressed to all officers, and which specifically concerned Mr. Warman. The Memorandum contained a picture of Mr. Warman, it provided his class schedule, and described his motor vehicle, his license plate number, and his student permit number. The Memorandum read, substantively:

> Below is the photograph of Matthew Warman. If you see him on Campus, stop him and check to see how he is doing. Politely ask why he is here. You are not to arrest him or tell

him to leave Campus. Just keep an eye on him. (Keep in mind that he is a student here and has the right to be on Campus).

68.     Mr. Warman had broken no laws, had not acted in a manner that was harmful to himself or to anybody else, and was a stellar student. The Memorandum, a copy of which is attached hereto as **Exhibit A**, and is incorporated herein, violated Mr. Warman's civil rights and is a shocking in its singling him out for harassment, humiliation, and exposed him to potential harm through provocation.

69.     On September 20, 2021, Mr. Warman was approached by Defendant Koopman outside of one of Mr. Warman's classes, while Mr. Warman was on the telephone with his doctor, asked Mr. Warman what he was doing there, despite knowing that Mr. Warman was completely within his rights to be there, and then thereafter just watched Mr. Warman as he spoke on the phone, which was intimidating and harassing, and was an unprivileged act.

70.     On September 20, 2021, Defendant Amy Metzger, a/k/a Amy Demko, MSN, RN, an employee of MSJU, denied Mr. Warman's religious exemption.

71.     Defendant Metzger's declination email referred Mr. Warman to Defendant Ellerman who, upon information and belief, created the Policy, solely or in conjunction with Metzger, and/or Elliot, and/or John Does 1-20, made the determination that Mr. Warman would not be granted an exemption, and who, upon information and belief, was ultimately responsible for overseeing and/or permitting the misconduct of Defendants MSJPD, Koo, and Koopman.

72.     MSJU gave no consideration to FDCA § 564 and its absolute command that Mr. Warman was entitled under federal law to decline the subject EUA vaccines without penalty.

73.     On September 21, 2021, Mr. Warman was called to defendant Elliott's office and met with her. Defendant Kooperman stationed himself outside the door in an open effort to intimidate and harass Mr. Warman. Mr. Warman specifically advised Elliott that he had been a

13

victim of police harassment, which Elliott essentially ignored and never pursued on Mr. Warman's behalf, as was her obligation given her position and, supposedly, moral authority.

74.    Defendant Elliott explained to Mr. Warman that he was morally obligated to get vaccinated, and that his religious mores had to change with the times, thus making it abundantly clear that MSJU was not going to grant him an exemption despite his sincerely held religious beliefs.

75.    Defendant Elliott also asserted that she was obligated to follow Pope Francis' position, which is that getting vaccinated for COVID-19 is a moral obligation of Catholics, and that as such, she could not veer from such papal edict.

76.    On or about March 14, 2022, MSJU terminated the Policy, despite Pope Francis not having made any statement that getting vaccinated for COVID-19 is no longer a moral obligation, thus evidencing that Defendant Elliott was not following the Pope's guidance with respect to denying religious exemptions from the Policy, as she had specifically and fraudulently asserted.

77.    On September 22, 2021, Mr. Warman sent an appeal of the denial to MSJU, again explaining that his sincerely held religious beliefs precluded him, in his conscience, from accepting the vaccine.

78.    At or around the time that Mr. Warman submitted his appeal, he contacted the Cincinnati Children's Hospital Medical Center ("CCH") where he was to perform his clinical work, and where the remainder of his schooling would take place after the fall semester, in order to earn his degree.

14

79.     Mr. Warman spoke with a Human Resources manager at CCH and inquired as to whether CCH offered religious exemptions for those who were unvaccinated but were working in the hospital. He was advised, in fact, that CCH did provide such religious exemptions.

80.     Thereafter, on September 30, 2021, Defendant Nancy Hinzman contacted Mr. Warman to advise him that he may not contact CCH in order to seek an exemption, but rather, that he only could get an exemption through MSJU, and prohibiting him from further direct contact with CCH, even though CCH would have considered his exemption request, and was the location at which the remainder of Mr. Warman's graduate studies were going to be conducted

81.     Indeed, on September 30, 2021, Mr. Warman received an outstanding evaluation from his supervisor at CCH with respect to his clinical work with pediatric patients, which concluded:

> With the dedication and progress Mathew has made throughout this clinical, I think he would offer a unique perspective and personality to pediatric psychiatric, and would make a great pediatric psychiatrist nurse.

A true copy of such evaluation is attached hereto as **Exhibit B** and is incorporated herein by reference.

82.     On October 4, 2021, Defendant Amy Metzer, a/k/a Amy Demko, again denied Mr. Warman's religious exemption request, upon information and belief, with the assistance or at the direction of Defendants Ellerman and/or Elliott and/or John Does 1-20.

83.     Defendants gave no consideration to FDCA § 564 and its absolute command that Mr. Warman was entitled under federal law to decline the subject EUA vaccines without penalty, before denying his appeal.

84.     As a result of its denying Mr. Warman his religious exemption, and precluding him from contacting CCH directly, MSJU, Metzger, and Hinzman rendered it impossible for Mr.

Warman to complete his studies and clinical work, which provided him with a tremendously promising future, unless he violated his conscience and took a COVID-19 vaccine, contrary to the FDCA § 564 and related regulations as set forth above.

85. On November 9, 2021, one of Mr. Warman's professors, Dr. Bolden, advised the class that classes could no longer end early since the class had been let out early the prior class session, after which campus police came looking for one of the male students in the class.

86. There were only approximately four male students in the class, none of whom had any prior issues with campus police, unlike Mr. Warman, who had been and continued to be harassed.

87. Upon information and belief, the communication by campus police with Dr. Bolden, which then was passed on by Dr. Bolden to the class, was a technique used by Defendants to harass and intimidate Mr. Warman, and to cast him in a false light and otherwise to invade his privacy.

88. Mr. Warman reasonably feared that he was again being singled out for harassment and made inquiry of Dr. Bolden as to whom the police were looking for but was not given an answer.

89. Given his reasonable fears with respect to Defendants MSJPD, Koopman, and Koo, Mr. Warman thereafter filed a complaint on the campus police website with respect to the harassment he received. Mr. Warman received no response or resolution after filing his complaint and, to this day, Defendants Koo and Koopman are believed not to have been disciplined in any way for their conduct either by Defendants MSJU or MSJPD.

90. Following his making such complaint to the MSJPD, Mr. Warman's Veterans Administration psychiatrist was contacted by an unidentified individual (who is among John Does

16

1-20, and possibly working for and/or under the direction and putative authority of ABC Agency, Inc. 1-5) who asserted that he was with the Federal Bureau of Investigation, and who advised that he had been contacted by MSJPD to investigate Mr. Warman.

91.     Upon information and belief, Defendants Koopman and/or Koo had contacts with the FBI, and had the individual call Mr. Warman's Veterans Administration psychiatrist as a means of intimidating and harassing Mr. Warman, retaliating against him for filing a complaint with the MSJPD, and attempting to cause the psychiatrist falsely to believe that Mr. Warman presented a physical danger to students and staff on campus, a risk of danger to himself, and a risk for causing campus violence, all of which was completely baseless and false. It is unknown whether said individual actually was with the FBI or was only holding himself out as such.

92.     As a result of the harassment, intimidation, and illegal conduct as aforesaid, Mr. Warman suffered great exacerbation of his conditions of anxiety and depression, was placed in fear for his safety and for his life, and feared coming to campus, which was an effort, in whole or in part, to have Mr. Warman declared to be a dangerous individual, so that his legally owned firearms would be confiscated by authorities. As a direct and proximate result thereof, and of the harassment, humiliation, and intimidation he faced prior thereto, Mr. Warman dropped out of school and has suffered pecuniary damages including, but not limited to, the obligation to return stipend funds he had received from the Veterans Administration for attending graduate school.

93.     Upon learning that MSJU rescinded the Policy, Mr. Warman was caused to suffer additional physical and emotional trauma knowing that Defendants had acted against him in such a damaging fashion, and had caused Mr. Warman to leave a program which would have given him an opportunity to be a member of a lucrative profession that he loved, and which would have allowed him to help people in need, which was his primary goal in undertaking such studies.

94.    All acts or omissions of Defendants herein were with malicious purpose, in bad faith, were willful and intentional and/or were undertaken in a wanton or reckless manner in callous disregard of Mr. Warman's rights, and/or were negligent, and would have caused mental suffering, shame, and humiliation to a person of ordinary sensibilities, and thereby caused Mr. Warman damage.

## CAUSES OF ACTION

### FIRST COUNT
**(42 USC 1983: Violation of Civil Rights)**
**(As to all Defendants)**

95.    Mr. Warman repeats and realleges each and every allegation above, as if it is set forth herein at length.

96.    At all or some pertinent times, Defendants were state actors who were acting under color of law.

97.    Upon information and belief, Defendants, or some of them, conspired to violate and/or did actually violate the free exercise of Mr. Warman's religion, and his right to bear arms, which rights are protected by the First, Second, Fourth, and Fourteenth Amendments of the United States Constitution, and provisions of the Ohio Constitution.

98.    Defendants, individually and in concert with one another at various times, and in various iterations, acted to discriminate and/or retaliate against Mr. Warman for his freely exercising his religious preference, based upon his sincerely held beliefs, not to be vaccinated.

99.    By virtue of their wrongful and malicious acts, Mr. Warman has suffered severe emotional distress and physical injury, including exacerbation of negative health conditions which pre-existed his enrollment at MSJU, severe psychological and emotional distress, and pecuniary damage.

18

**SECOND COUNT**
**(42 USC § 1985 Conspiracy to Violate Civil Rights)**
**(As to All Defendants)**

100.    Mr. Warman repeats and reasserts each and every allegation above, as if fully set forth herein at length.

101.    Upon information and belief, Defendants in their capacities as state actors, or some of them, conspired on one or more occasions to damage Mr. Warman in the exercise of his civil rights as aforesaid and below, which allegations are incorporated herein by reference, in violation of 42 U.S.C. § 1985, thus causing Mr. Warman damage.

**THIRD COUNT**
**(American With Disabilities Act, 42 U.S.C. § 12101 *et seq.*)**
**(As to All Defendants)**

102.    Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

103.    Mr. Warman did, in fact, suffer with physical and/or mental disabilities known, or which reasonably should have been known, to Defendants, which disabilities substantially limited one or more major life activities and which, in whole or in part, resulted in Mr. Warman's receiving a Medical Discharge from the United States Marines.

104.    Defendants also regarded Mr. Warman as disabled, believing that he suffered from an impairment which would, in their view, substantially limit one or more major life activities, based on his refusal of COVID-19 vaccinations.

105.    Defendants, at different times, in different ways, and in different combinations, purposely discriminated against Mr. Warman based on his actual and/or perceived disabilities, thus causing him damage. Alternatively, Defendants' failure to reasonably accommodate Mr. Warman's perceived disabilities violated his rights under the ADA.

19

**FOURTH COUNT**
**(42 U.S.C. § 1982–Equal Protection)**
**(As to All Defendants)**

106.    Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

107.    Numerous individuals attended MSJU and otherwise were similarly situated to Mr. Warman and, upon information and belief, others sought religious and/or medical exemptions.

108.    Defendants intentionally treated Mr. Warman differently than all such similarly situated individuals.

109.    There was no rational basis for Defendants' actions, as state actors, with respect to the unequal treatment of Mr. Warman, in violation of his right to the equal protection of the laws, and who suffered damages thereby.

**FIFTH COUNT**
**(Intentional Infliction of Emotional Distress)**
**(As to All Defendants)**

110.    Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

111.    By their actions at various times and in various ways, Defendants intentionally and/or recklessly caused Mr. Warman to suffer serious emotional distress.

112.    The conduct of Defendants in causing such emotional distress was extreme and outrageous and utterly intolerable in a civilized society.

113.    As a result thereof, Defendants' conduct was a direct and proximate cause of Mr. Warman's serious and foreseeable emotional distress, and related damages which he suffered thereby.

20

**SIXTH COUNT**
**(Invasion of Privacy)**
**(As to all Defendants)**

114.   Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

115.   By their actions of posting Mr. Warman's picture, class schedule, vehicle make, model, and license plate, permit number, writing alleged information about Mr. Warman, and affirmatively instructing campus police to approach and, essentially, harass Mr. Warman, Defendants acted in a manner which would cause a person of ordinary sensibilities mental suffering, shame, and/or humiliation.

116.   By having the FBI or someone posing as an FBI agent contact Mr. Warman's psychiatrist in the manner that occurred, Defendants acted in a manner which would cause a person of ordinary sensibilities mental suffering, shame, and/or humiliation.

117.   By following Mr. Warman on campus, approaching him, and communicating with one or more of his professors, which was then communicated with other students, about a person reasonably identifiable as Mr. Warman, Defendants, or some of them, acted in a manner which would cause a person of ordinary sensibilities mental suffering, shame, and/or humiliation.

118.   All such acts by Defendants, or some of them, and without limitation, constituted an unwarranted exploitation and/or appropriation of Mr. Warman's personality and/or the publicity of Mr. Warman's private affairs with which the public has no legitimate concern, and/or the wrongful intrusion into Mr. Warman's private activities.

119.   Such acts intentionally intruded on Mr. Warman's private seclusion and/or private affairs, which acts were highly offensive to Mr. Warman, and would be to a reasonable person, and thereby caused him damage.

**SEVENTH COUNT**
**(False Light)**
**(As to All Defendants)**

120.   Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

121.   Defendants, or some of them, gave publicity to matters concerning Mr. Warman that placed Mr. Warman before the public in a false light.

122.   Such placement of Mr. Warman in a false light was highly offensive to him, as it would be to a reasonable person.

123.   Defendants knew and/or acted with reckless disregard as to the falsity of the publicized matter and the false light in which Mr. Warman would be placed by such actions.

124.   Without limitation, and by way of example, by placing the subject leaflet on the police bulletin board, engaging Mr. Warman on campus, communicating with his professors, having the professors communicate with students in the class, and contacting his psychiatrist, Defendants, or some of them, created the false impression that Mr. Warman was mentally defective and/or dangerous and/or engaged in criminal acts and/or harbored "incorrect" religious beliefs, all of which constituted misrepresentations of Mr. Warman's character, history, activities, and/or beliefs.

125.   All of the aforesaid misrepresentations were false, and all such communications were designed to reach the public or were engaged in with reckless disregard that same was likely to be made public.

126.   Such conduct in whole, in part, and/or alone, would be highly offensive to a reasonable person, and Mr. Warman has been damaged thereby.

**EIGHTH COUNT**
**(Wrongful Arrest)**
**(As to Defendants MSJU, MSJPD, Koopman, Elliot, and Koo)**

127.   Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

128.   Defendants Koopman, Koo, MSJPD, and MSJU as their employer, and upon information and belief with Defendant Elliott's knowledge and encouragement, arrested Mr. Warman in fact, without probable cause and with malicious purpose, in bad faith, and in a reckless and wanton manner.

129.   Mr. Warman was damaged thereby.

**NINTH COUNT**
**(False Imprisonment)**
**(As to Defendants MSJU, MSJPD, Koopman, Elliot, and Koo)**

130.   Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

131.   Defendants, or some of them, confined Mr. Warman intentionally, without lawful privilege, and without the consent of Mr. Warman, who had been badgered with multiple phone calls and emails as aforesaid to come to the campus police station on a day when he was not scheduled to be on campus.

132.   As a result, Mr. Warman was deprived of his liberty by said Defendants without lawful justification, and thus caused Mr. Warman damage.

**TENTH COUNT**
**(Tortious Interference with Contract)**
**(As to All Defendants Except MSJU)**

133.   Mr. Warman repeats and reasserts each and every allegation above, as if fully set forth herein at length.

134. Defendants other than MSJU, or some of them, knew that Mr. Warman had a contract with MSJU with respect to his graduate education.

135. By their actions, such Defendants intentionally procured the breach of such contract by refusing Mr. Warman's religious exemption, interfering with his ability to get such an exemption from CCH without reasonable justification and/or in violation of law, and acting toward him in a manner which made performance of that contract completely damaging and unreasonable, thus causing Mr. Warman damage.

**ELEVENTH COUNT**
**(Breach of Contract)**
**(As to Defendant MSJU)**

136. Mr. Warman repeats and reasserts each and every allegation above, as if fully set forth herein at length.

137. Mr. Warman had a contract with MSJU with respect to his graduate education.

138. By its actions, and that of its employees and/or agents, Defendant MSJU breached said contract including, but not limited to, adding an EUA vaccine requirement for continued enrollment, attempting to compel Mr. Warman to be vaccinated in violation of his statutory and constitutional rights, violating the provisions to the Catalog, including violating the Nondiscrimination Policy related to disability and religious beliefs, failure to comply with anti-discrimination laws in performing the contract, and failure to accept Mr. Warman for his religious beliefs, contrary to the Mission Statement providing for acceptance of a diversity of beliefs, thus causing Mr. Warman damages.

**TWELFTH COUNT**
**(Breach of Covenant of Good Faith and Fair Dealing)**
**(As to Defendant MSJU)**

139. Mr. Warman repeats and reasserts each and every allegation above, as if fully set forth herein at length.

140. By its conduct aforesaid, MSJU intentionally, recklessly and/or knowingly breached the covenant of good faith and fair dealing, express or implied, within its contract with Mr. Warman.

141. Mr. Warman has been damaged thereby.

**THIRTEENTH COUNT**
**(Assault)**
**(As to Defendants MSJU, MSJPD, Koopman, Elliot, and Koo)**

142. Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

143. By their actions as aforesaid, Defendants Koo, Koopman, Elliott, MSJPD, and MSJU, placed Mr. Warman in reasonable fear of imminent bodily harm and/or unprivileged touching by: (1) detaining Mr. Warman; (2) following, and confronting him on campus; (3) placing a flier on the police department bulletin boards instructing campus officers to confront Mr. Warman; and (4) having an alleged FBI agent contact Mr. Warman's psychiatrist.

144. Defendants' actions were intentional and were designed to intimidate Mr. Warman and place him in such reasonable fear.

145. As a result thereof, Mr. Warman has suffered damages.

**FOURTEENTH COUNT**
**(Civil Conspiracy)**
**(As to All Defendants)**

146. Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

147. Defendants in one or several combinations conspired with one another to injure Mr. Warman in his person or property as aforesaid.

148. As a result thereof, Mr. Warman has been damaged.

**FIFTEENTH COUNT**
**(Negligence)**
**(As to All Defendants)**

149. Mr. Warman repeats and reasserts each and every allegation above as if they are fully set forth herein at length.

150. Without limitation, Defendants owed Mr. Warman a duty or duties to allow him to attend MSJU, to attend classes and be on campus without unreasonable interference, to create policies which do not violate law and/or which did not violate law, and/or reasonably to ensure that Mr. Warman's complaints and concerns related to same would be fully and fairly examined and investigated in a neutral manner.

151. By their actions as aforesaid, Defendants breached such duties such that it was foreseeable to a reasonably prudent person that Mr. Warman would be damaged

152. Such breaches were the direct and proximate cause of damages to Mr. Warman.

26

## SIXTEENTH COUNT
### (Negligent Hiring/Retention)
### (As to MSJU and MSJPD)

153.     Mr. Warman repeats and reasserts each and every allegation above as if fully set forth herein at length.

154.     Defendants Koo and Koopman are employees of Defendant MSJU and/or Defendant MSJPD, who were hired to perform law enforcement services for a state sanctioned police force, and whose incompetence as law enforcement officers was demonstrated by virtue of their conduct as related to Mr. Warman.

155.     Upon information and belief Defendants MSJU and/or MSJPD knew, constructively knew, or reasonably should have known of Defendants Koo and Koopman's incompetence.

156.     Indeed, after suffering the initial indignities of the in-person acts of Koo and Koopman, Mr. Warman reported their conduct to MSJU and MSJPD, or individuals employed thereby who had a duty to report same, neither of which took action thereafter to investigate or discipline Defendants Koo or Koopman.

157.      Defendants Koo and Koopman continued causing harm to Mr. Warman after such reports.

156.     By hiring and/or retaining Defendants Koo and Koopman, Defendants MSJU and/or MSJPD directly and proximately caused damage to Mr. Warman.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

     A.  Actual damages;

     B.  Compensatory damages equal to Plaintiff's emotional pain and suffering;

C.   Punitive damages;

D.   Interest as allowed by law;

E.   All costs of suit, including reasonable attorneys' fees and expert costs; and

F.   Such other and further relief as this Court deems equitable and just.

Respectfully submitted,

*/s/ Matthew S. Okiishi*

_____

Matthew S. Okiishi (00096706)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Ste 225
Cincinnati, Ohio 45245
(513) 943-6659
(513) 943-6669 – fax
matt@finneylawfirm.com

Ronald A. Berutti (NJ Bar #023361992/*Pro Hac Vice Pending*)
MURRAY-NOLAN BERUTTI LLP
100 E. Hanover Avenue, St. 401
Cedar Knolls, New Jersey 07927
ron@murray-nolanberutti.com
*Attorneys for the Plaintiff*

## **JURY DEMAND**

Plaintiff demands a trial by a jury on all issues so triable.

*/s/ Matthew S. Okiishi*

_____

Matthew S. Okiishi (00096706)

## **VERIFICATION**

MATTHEW WARMAN, of full age, hereby states the following under penalty of perjury:

I have read the foregoing Complaint and know the contents thereof. I hereby affirm that the allegations therein are true, except those made on information and belief, which I believe to be true.

_Matthew Warman_

Matthew Warman

Dated:  April 28, 2022